IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUDY LOUISE METELLI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 16-6094 |
| NANCY A. BERRYHILL,[1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

**MARILYN HEFFLEY, U.S.M.J.**　　　　　　　　　　　　　　　　　　　　　　　**May 26, 2017**

　　　　Judy Louise Metelli ("Metelli") seeks review, pursuant to 42 U.S.C. § 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying her claim for Disability Insurance Benefits ("DIB"). For the reasons that follow, I recommend that Metelli's Request for Review be granted and that the matter be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## I.　　FACTUAL AND PROCEDURAL BACKGROUND

　　　　Metelli was born on March 24, 1956. R. at 197.[2] She has a high school education. Id. at 216. Her past relevant work experience was as an officer/manager in a bank. Id. at 217. Metelli filed her application for DIB on August 15, 2013, asserting that she had become disabled as of

---

[1] On January 23, 2017, Carolyn W. Colvin was succeeded by Nancy A. Berryhill as the Acting Commissioner of the Social Security Administration. See http://www.lb7.uscourts.gov/documents/15-1210.pdf (last visited May 26, 2017). Accordingly, pursuant to Fed. R. Civ. P. 25(d), she is substituted as the named Defendant in this action.

[2] Citations to the record will be indicated by "R." followed by the page number.

November 26, 2012, id. at 13, due to a double aneurysm (one ruptured and one not) and the surgery to repair the aneurysms, id. at 215. Her application initially was denied on July 23, 2013. Id. at 83-86. Metelli requested a hearing, which was held before an Administrative Law Judge ("ALJ") on April 3, 2015. Id. at 30-65. The ALJ denied Metelli's application for DIB in a decision issued on May 1, 2015. Id. at 13-25. Metelli filed a timely appeal with the Appeals Council, which denied her request for review on September 22, 2016, thereby affirming the ALJ's decision as the final decision of the Commissioner. Id. at 1-5. Metelli then commenced this action in federal court.

## II. STANDARD OF REVIEW

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter is to uphold any factual determination made by the ALJ that is supported by "substantial evidence." 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). The court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's finding of fact." Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).

Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v.

Underwood, 487 U.S. 552, 564-65 (1988)); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). The court's review is plenary as to the ALJ's application of legal standards. Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period. 42 U.S.C. § 423(d)(1). As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirements in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

## III. THE ALJ'S DECISION

In her decision, the ALJ found that Metelli suffered from the severe impairments of status post subarachnoid hemorrhage, status post craniectomy, and compression fractures in the

thoracic spine. R. at 15. The ALJ concluded, however, that none of Metelli's impairments, nor the combination of those impairments, met or medically equaled a listed impairment. Id. The ALJ found that Metelli had a residual functional capacity ("RFC") "to perform light work as defined in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.125 and 404.1562)." Id. at 18. Relying upon the testimony of the vocational expert ("VE") who appeared at the hearing, the ALJ determined that Metelli was able to perform her past work "as an assistant bank manager for a financial institution." Id. at 24. Accordingly, the ALJ concluded that Metelli was not disabled. Id. at 25.

## IV. METELLI'S REQUEST FOR REVIEW

In her Request for Review, Metelli contends that the ALJ erred in concluding that she could perform her past work. More particularly, she argues that the ALJ erred in: (1) failing to properly address the medical evidence; (2) failing to include any mental limitations in her RFC; and (3) relying on VE testimony that conflicted with the Dictionary of Occupational Titles without resolving the conflict. I agree with Metelli that the ALJ's ruling that she was capable of performing her prior work is not supported by substantial evidence and recommend that this case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## V. DISCUSSION

### A. Legal Standard for Determining Whether a Claimant Can Perform His or Her Past Work

The standard for determining whether a claimant can perform his or her past work is set out in SSR 82-62, 1982 WL 31386 (1982). That Ruling directs ALJs to perform "careful consideration of the interaction of the limiting effects of the person's impairment(s) and the

4

physical and mental demands of his or her PRW [(past relevant work)] to determine whether the individual can still do that work." Id. at *2. It directs that in that analysis, an ALJ must perform:

> a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits [the] ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

Id. at *3.

The regulation further directs that:

> [t]he decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.
>
> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).
>
> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience. In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

Id.

B. **The ALJ Erred in Evaluating the Medical Evidence Regarding the Extent of Metelli's Mental Impairment**

The evidence of record reflects that, on November 26, 2012, Metelli was brought to the Emergency Department at Thomas Jefferson University Hospital after her son found her unresponsive in her home. R. at 293. CT exams showed that she had suffered a "large subarachnoid hemorrhage in basilar cisterns related to acute anterior communicating artery aneurysm." Id. She underwent a craniectomy for surgical repair of the hemorrhaged aneurysm and clipping of another aneurysm on November 27, 2012. Id. Metelli's hospital discharge summary, dated December 22, 2012, reported that "the patient was recognized to have moderate cognitive linguistic deficits, now assessed as mild. Due to impulsivity and lack of safety awareness, she requires supervision level for ADLs [(activities of daily living)] and ambulation. The patient should also have assistance with memory, concentration, language, and calculations which she still has problems accomplishing these tasks." Id. at 297.

On March 13, 2013, at her primary care physician's referral, Metelli saw a doctor who practiced rehabilitation medicine, Dr. Pikai Oh. Id. at 314-15. Dr. Oh reported that Metelli was "awake, alert and oriented x3," and that she had "very mild persistent cognitive deficits." Id. at 315. He reported that Metelli was getting therapy at the time and would continue to do so. Id. Dr. Oh opined that: "I still think she has some cognitive deficits at the higher level." Id.

Dr. Oh referred Metelli for a neuropsychological evaluation to Joely P. Esposito, Psy.D., a licensed psychologist and a Diplomate of the American Board of Professional Neuropsychology. Id. at 329-37. Dr. Esposito performed that evaluation on August 28, 2013. Id. at 329. During a clinical interview, Metelli informed Dr. Esposito that, since her surgery, she had "difficulty with attention and concentration, such that she ha[d] poor focus and trouble multitasking." Id. at 330. She reported that if she was interrupted, she tended to forget what she

6

was doing and that she had difficulty with short-term or recent memory. Id. Metelli stated that she had difficulty remembering conversations and had been told that she repeated herself. Id. She also related that, when she was reading, she would sometimes "skip things" and that she transposed numbers. Id. Metelli also reported that she had difficulty with her ability to remember to do things in the future and that she had "wordfinding problems." Id. Metelli's daughter, who attended the evaluation, confirmed that Metelli's description of her cognitive problems was accurate. Id. at 331. Dr. Esposito administered a battery of neuropsychological testing to Metelli.[3] See id. at 332. The testing reflected that Metelli's overall memory abilities rated in the average to low average range with a few measurements on individual memory components ranking in the high average range. See id. at 333-34. Metelli's neuropsychological functioning ranked in the below average range when compared with other women of similar age, education and general ethnicity. Id. at 334. As to academic functioning, Metelli's individual word reading abilities were in the low average range, while her sentence comprehension, written arithmetic and spelling skills were in the average range. Id. at 335. Metelli scored 17 on the Beck Depression Inventory, which demonstrated a mild level of depression and 21 on the Beck Anxiety Inventory, which reflected a moderate level of anxiety. Id.

Dr. Esposito provided a summary of her diagnostic impressions. Id. at 335-37. She found that:

> Mrs. Metelli's overall intellectual abilities were assessed to be within the average range with comparable verbal and nonverbal problem-solving skills. Her

---

[3] Dr. Esposito administered the following tests: Halstead-Reitan Neuropsychological Test Battery, Wechsler Adult Intelligence Scale-IV, Wechsler Memory Scale-IV, Peabody Picture Test, Rey Auditory-Verbal Learning Test, Controlled Oral Word Association Test, Symbol Digit Modalities Test, Grooved Pegboard, Wide Range Achievement Test-4th Edition, Test of Memory Malingering, Beck Depression Inventory-II, Beck Anxiety Inventory, and a clinical interview. R. at 332.

7

> composite score on measures that are sensitive to cortical functioning was Below Average when demographically corrected. She demonstrated particular impairment on some tests of auditory-verbal and visual memory, incidental memory and multitasking. She also demonstrated relative weaknesses in mental arithmetic and mental manipulation, cognitive flexibility, novel abstract problem-solving, and rapid verbal fluency. Mrs. Metelli appeared to become overwhelmed when presented with a large amount of information and there was evidence of interference effects on her memory. She demonstrated difficulty encoding and retaining information, particularly if she is not purposely attending to it.

Id. at 335.

Dr. Esposito further opined that "[t]he cognitive impairments demonstrated on this evaluation would impact on Mrs. Metelli's ability to learn and remember new information, as well as her ability to engage in multitasking and higher level reasoning and cognitive flexibility." Id. at 336. She reported that the results of her evaluation and testing "reflect impairment of those functions most associated with the frontal and temporal regions of the brain, and are consistent with Mrs. Metelli's history of an aneurysm and surgery." Id. Dr. Esposito indicated that, "given that it ha[d] been less than one year since her injury, further spontaneous recovery of brain functioning [was] to be expected," and she recommended further cognitive therapy and psychotherapy. Id. The record does not reflect that Metelli followed that recommendation.

In October 2014, Metelli was again admitted to Thomas Jefferson University Hospital after she had a fall in which she suffered a fractured left humerus. Id. at 541. During her hospitalization, her doctors observed that the surgical scar from her craniotomy had parted exposing medical hardware in her cranium, and she underwent treatment for infection prevention and plastic surgery. Id. During her hospital treatment, Metelli underwent a neurological examination on October 2, 2014. Id. at 555. Treatment notes from that examination include checked boxes on an evaluation form indicating that Metelli was "normal" (as opposed to "abnormal") with respect to: her ability to communicate; the condition of her eyes; muscle

8

strength and tone; orientation as to person, time and place; recent and remote memory; attention span/concentration; and the condition of her cranial nerves. Id.

In evaluating the evidence, the ALJ determined that Dr. Esposito's opinion should be "given little weight as to the issue of severity of cognitive deficits, because she saw the claimant for evaluation only and is not a treating source (Exh. 8F). Additionally, her evaluation was in August-September 2013, less than 12 months after the claimant had an aneurysm." Id. at 23. The ALJ decided that the opinion of Metelli's treating neurosurgeon, Dr. Stavropoula Tjoumakaris, was "more reliable and persuasive." Id. She based that decision on Dr. Tjoumakaris's status as a treating physician and on her position as "an Assistant Professor of Neurological Surgery at a highly respected institution." Id. That analysis is not supported by the record.

By referring to Dr. Tjoumakaris's "opinion," the ALJ meant the treatment notes form from the October 2, 2014 neurological examination that contained the checked boxes indicated that Metelli's neurological functions were normal, as opposed to abnormal. See id. at 23, 555. The record reflects that the form was completed by a hospital staff physician and that Dr. Tjoumakaris signed off on it sometime later. Id. at 556. Moreover, the record the ALJ relied upon is not Dr. Tjoumakaris's opinion about Metelli's ability to function in a workplace, but is a treatment note, intended to guide further medical treatment. "[A] doctor's assessment of a patient during an examination does not necessarily contradict a seemingly more restrictive statement about the patient's 'ability to function in a work setting.' . . . The Court of Appeals has expressly 'admonished ALJ's who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's

9

ability to work.'"[4] Jones v. Comm'r of Soc. Sec., No. 2:15-CV-01169-TFM, 2016 WL 738065, at *10 (W.D. Pa. Feb. 25, 2016) (quoting Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008)).

Dr. Tjoumakaris was a neurosurgeon and not a neuropsychologist. She did not provide any opinion regarding Metelli's ability to function in a workplace, let alone to perform the type of complex, skilled work she had performed prior to her hemorrhage. Moreover, it is not clear—indeed, it appears unlikely—that the notations on the treatment form made during a single examination that Metelli was "normal" in orientation, memory, attention span, speech and fund of knowledge, R. at 555, conflict in any way with the more specific measurements of the finer aspects of Metelli's intellectual functioning produced by Dr. Esposito's battery of neuropsychological testing, see id. at 329-37. Dr. Esposito's testing was not intended merely to determine if Metelli was "normal," but to closely evaluate specific aspects of her intellectual functioning. See id. Dr. Esposito's report contains no indication that she would not consider Metelli's intellectual functioning to be broadly defined as normal. As discussed infra in Section V(C), in light of the complex nature of Metelli's occupation, Dr. Esposito's opinion and the testing results are far more relevant to her ability to perform that occupation than are the measures of gross neurological functioning applied by a neurosurgeon, like Dr. Tjoumakaris. For these reasons, Dr. Tjoumakaris's treatment notes provide no basis for discrediting Dr.

---

[4] Courts also have held that forms in which a physician merely checks a box without giving an explanation provide "'weak evidence at best' in the context of a disability analysis." Smith v. Astrue, 359 F. App'x 313, 316 (3d Cir. 2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)); see also Wise v. Comm'r of Soc. Sec., 626 F. App'x 357, 360 (3d Cir. 2015) ("[W]e have said that ALJs are not required to give any weight to these fill-in-the-blank and checklist portions of RFC assessments and that their focus instead should be on the narrative portions of the assessments where the medical experts expound on their opinions.").

10

Esposito's opinion. Instead, Dr. Esposito's opinions of Metelli's intellectual functioning stand uncontradicted on this record.[5]

## C. The ALJ Erred in Not Including Any Mental Limitations in Metelli's RFC

The ALJ found that Metelli suffered from depression and cognitive dysfunction that were medically determinable impairments, but not severe impairments. R. at 17. More specifically, she found that Metelli's mental condition caused mild limitations in her activities of daily living and in her ability to maintain concentration, persistence or pace. Id. at 17-18. However, she erred in failing to include any indication that Metelli suffered from any mental health impairment in Metelli's RFC. An ALJ must include all of a claimant's medically supported impairments when formulating the claimant's RFC, even impairments that are not severe. Rutherford, 399 F.3d at 554; Ramirez v. Barnhart, 372 F.3d 546, 554-55 (3d Cir. 2004). "Having found that [Metelli's mental impairments we]re medically supported, and having acknowledged that there were mild limitations associated therewith, the ALJ had a duty to address those limitations in the

---

[5] The ALJ also discounted Dr. Esposito's opinion on the ground that she conducted her testing less than 12 months after Metelli's surgery. R. at 23. Dr. Esposito herself noted that some further recovery was still to be expected. Id. at 336. On the present record, however, there is simply no evidence regarding whether Metelli did make further recovery of her intellectual functioning, how much further recovery she might have made or how that recovery might have affected her ability to perform her past work. If the ALJ believed the potential for further recovery detracted from the value of Dr. Esposito's opinion, then she should have obtained a more recent set of testing by a consultative neuropsychologist that could have provided a factual basis for that belief. On the present record, there is no adequate factual basis to presume that Dr. Esposito's opinion was no longer accurate.

The ALJ's purported reliance on Dr. Shahla Vakili's report to contradict Dr. Esposito's report, id. at 22, is meritless. Dr. Vakili conducted a consultative physical evaluation of Metelli and submitted a Medical Source Statement. Id. at 320-28. In the context of her examination, Dr. Vakili stated the following: "No memory problems. Mini-mental examination revealed _____." This general description of Metelli's memory reached during a physical examination provides no reasonable basis for discounting neuropsychologist Esposito's detailed opinion regarding fine measurements of Metelli's memory abilities, which was based on extensive formal testing.

RFC assessment and the hypothetical question posed to the VE." Moore v. Colvin, ___ F. Supp. 3d ___, 2017 U.S. Dist. Lexis 22850, at *30 (D. Del. Mar. 8, 2017) (collecting cases); accord Harmon v. Astrue, No. 10-6781, 2012 WL 94617, at *2 (E.D. Pa. Jan. 11, 2012); see also Washington v. Astrue, No. 08-2938, 2009 WL 855893, at *1 (E.D. Pa. Mar. 31, 2009) (holding that an ALJ erred in failing to include mild limitations in social functioning and concentration in RFC and hypothetical to the VE); Davis v. Astrue, No. 06-3550, 2007 WL 2248830, at *3-4 (E.D. Pa. July 30, 2007) (same). Moreover, this requirement is especially important in cases involving claimants whose past relevant work was a skilled occupation. "Courts have found that 'even minimal deficits in [intellectual] functioning could impact [a claimant's] ability to successfully perform the [skilled] occupation.'" Moore, 2017 U.S. Dist. LEXIS 22850, at *31 (quoting Harmon, 2012 WL 94617, at *2) (remanding due to failure to include mild mental limitations in RFC in finding claimant could perform her past skilled work as a secretary); Layfield v. Colvin, No. 15-358-SLR-SRF, 2016 WL 4578327, at *14 (D. Del. Sept. 1, 2016) (remanding due to failure to include mild mental limitations in RFC in finding claimant could perform her past skilled work as a self-employed consultant and office manager), report and recommendation adopted, No. 15-358-SLR-SRF, 2016 WL 5213902 (D. Del. Sept. 20, 2016); Harmon, 2012 WL 94617, at *2 (remanding in light of failure to include mild mental limitations in RFC in finding claimant could perform her past work as a lawyer). Thus, the ALJ's failure to include any mental limitations in Metelli's RFC and in her hypothetical to the VE was erroneous and requires remand. Moore, 2017 U.S. Dist. Lexis 22850, at *30-31; Layfield, 2016 WL 4578327, at *14; Lindsay, 2014 WL 2804909, at *17.

> D. **The ALJ Erred in Failing to Obtain Sufficient Information Regarding Metelli's Past Work on Which to Base a Decision Whether Metelli Could Perform That Work Despite Her Mental Limitations**

In determining whether a claimant can perform his or her prior work at step four of the sequential analysis, SSR 82-62 is explicit in repeatedly stressing the need for ALJs to develop detailed and specific information about the skills and tasks involved in that work. It directs that "[s]ufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW [(past relevant work)] will contain enough information on past work to permit a decision as to the individual's ability to return to such past work . . . . Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations." SSR 82-62, 1982 WL 31386, at *3. The Ruling states that ALJs "must" obtain "[d]etailed information about strength, endurance, manipulative ability, mental demands and other job requirements . . . as appropriate." Id.; see also id. ("Past work experience must be considered carefully to assure [an evidentiary basis for] a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."). It mandates that "[e]very effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." Id. Any decision regarding a claimant's ability to perform past work "must be developed and explained fully in the disability decision." Id.

The case law enforces the requirement that ALJs obtain evidence detailing the functional requirements of a claimant's prior work and compare those requirements to the claimant's specific medical limitations. Garibay v. Comm'r of Soc. Sec., 336 F. App'x 152, 158 (3d Cir. 2009) (holding that ALJ must make findings of the physical and mental demands of the claimant's past work and compare them to the limitations in the claimant's RFC); see, e.g., Jimenez v. Astrue, No. CIV. A. 07-3556 (JAP), 2008 WL 5377781, at *11 (D.N.J. Dec. 19,

13

2008) (remanding because ALJ failed to "develop the record regarding the impact of Plaintiff's mental impairments on the performance of the particular duties required by her past relevant work"); Nunez-Ortiz v. Astrue, No. CIV. A. 07-3384, 2008 WL 2152552, at *1 (E.D. Pa. May 21, 2008) (remanding because "[t]he ALJ never made a finding of fact as to the mental demands of [claimant's job]"); Boulden v. Astrue, No. 07-4343 (RMB), 2008 WL 2835243, at *13 (D.N.J. July 18, 2008) (remanding because ALJ failed to compare claimant's sitting, standing and walking limitations to the demands of his past work); Stevenson v. Heckler, 624 F. Supp. 1189, 1191 (E.D. Pa. 1986) (remanding because ALJ "did not adequately consider the relationship between plaintiff's medical impairments and the specific requirements of his former job").

"The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3. In the present case, the ALJ failed to obtain from Metelli at the hearing sufficient information about the specific functional requirements of Metelli's prior work to allow her to conduct the required comparative analysis. The discussion at the hearing of the mental requirements of Metelli's prior work was extremely sparse and general. Metelli testified that her title was "a bank officer and also a floor manager." R. at 44. The ALJ proceeded to ask Metelli about the physical requirements of her position, but did not inquire as to its intellectual requirements. See id. Later, in response to a question asking what problems she had that she felt would prevent her from working, Metelli responded: "My—losing my memory, I think would hurt me. The job I had was very—I want to say exhausting, but very minute work that you can't forget things." Id. at 47. The ALJ went on to inquire about her then-current memory problems, but failed to inquire

14

any further about the activities Metelli performed in her past work or the role that memory would play in that work.  Id.

Prior to giving her testimony, the VE asked Metelli at which bank location she worked and Metelli responded that she worked in the "operation center."  Id. at 60.  Then, the following colloquy took place:

> ALJ:  Oh, do you have a question?
>
> VE:  —there are so many different types of banks and the facilities and Wachovia, Core States and Wells Fargo have a big presence in the area.  So it might have been more than just, you know, a bank working in the outside branch.
>
> ALJ:  You mean whether she was working in the customer-related section or non-customer related?
>
> VE:  Correct.
>
> . . .
>
> Metelli:  I wasn't in the customer part I was in operations.

Id.  The ALJ then asked the VE to describe Metelli's work history both as she actually performed it and as it is generally performed in the national economy.  Id. at 61.  The VE responded: "Well, that changes things a little bit, and that's why I asked.  I had it as—and I'll continue it as an assistant bank manager for a financial institution."  Id.  She identified the position as DOT #3186.167-070.  Id. (citing Department of Labor, Dictionary of Occupational Titles #3186.167-070 (4th ed. 1991) [hereinafter "DOT"]).

The limited information that the ALJ obtained at the hearing was an insufficient basis to permit the ALJ to conduct the type of detailed analysis of the intellectual requirements of Metelli's former position that is required by the regulations and the case law.  In light of the skilled nature of that work, the ALJ was obligated to obtain detailed information regarding the specific demands of the work and to conduct a close examination of the intellectual functions

necessary to perform the specific activities that the work required. See Garibay, 336 F. App'x at 158; Jimenez, 2008 WL 5377781, at *11; Nunez-Ortiz, 2008 WL 2152552, at *1; Boulden, 2008 WL 2835243, at *13; Stevenson, 624 F. Supp. at 1191. The information the ALJ obtained here, however, did not identify the tasks that made up Metelli's work or permit any meaningful evaluation of the cognitive functioning those tasks required.

In her initial Disability Report, Metelli described her work as follows: "She ran a one block long bank operations office. She settled deposits, ran reports at the end of the night, did employee reviews and processed work on a 10 key NCR machine. She also was responsible for managing the bank flow." R. at 217. Even if this general description could be considered sufficient to allow judgments to be made regarding whether Metelli's remaining intellectual functioning was sufficient to accomplish the specific activities that her prior job required—which it is not—the ALJ gave no indication that she even was aware of Metelli's description, let alone any explanation of how she found it to be an adequate basis for a conclusion. The ALJ was required to "develop[] and explain[] fully" her decision that Metelli could perform her past work. SSR 82-62, 1982 WL 31386, at *3: see also Cotter v. Harris, 642 F.2d 700, 704-05 (3d Cir. 1981) (failure to discuss the evidence on which a decision is based leaves a reviewing court no meaningful ability to review a decision). Here, the ALJ failed to comply with that requirement. If the ALJ relied on Metelli's Disability Report, her decision does not reflect it.

The ALJ failed in her obligation to make "every effort . . . to secure evidence that resolves the issue [whether the claimant can perform his or her past work] as clearly and explicitly as circumstances permit." SSR 82-62, 1982 WL 31386, at *3. As a result, the ALJ failed to meet the regulatory requirement that she engage in "careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental

demands of his or her PRW to determine whether the individual can still do that work." Id. at *2; see also Stevenson, 624 F. Supp. at 1191 (remanding because ALJ "did not adequately consider the relationship between plaintiff's medical impairments and the specific requirements of his former job" (citing Baeder v. Heckler, 768 F.2d 547 (3d Cir. 1985); Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985))). This evidentiary deficiency is exacerbated by the fact that Metelli's ability to perform her prior work may depend on fine distinctions in her mental RFC and in the specific requirements of her prior position. While a claimant's inability to lift more than a certain weight is a straightforward determination, Metelli's ability to perform particular tasks involved in the operations of a major national banking institution requires closer analysis. It is very likely that certain positions in the operations of such a financial institution could not be performed by a person with average to low average intellectual functioning; others possibly could be. On the current record, there is no evidentiary basis on which to base such a determination regarding Metelli's former work. Where the record contains insufficient evidence to support a determination whether a claimant is capable of performing the particular functional requirements of his or her prior work, remand is required. Wynne v. Colvin, No. CIV. A. 14-2081, 2015 WL 4450953, at *6 (E.D. Pa. July 20, 2015); Standowski, 2015 WL 404659, at *16.

Nor does the VE's testimony provide the missing evidentiary basis for the ALJ's determination that Metelli could perform her prior work. The only information the VE had about the particular intellectual functions required for Metelli's prior work is the limited discussion at the hearing. Even though the VE recognized that Metelli was not working in a branch, but was involved in banking operations, she still based her opinion on DOT #186.167-070, which is the description for the position of "Assistant Branch Manager, Financial Institution." That DOT job description involves a variety of activities, such as customer service, public relations, business

development and working with branch-specific documents and transactions, that are unrelated to the activities Metelli described in her Disability Report.[6] See R. at 217. Another DOT job description, that of "Operations Officer (financial)," DOT #186.137-014, more closely matches the description Metelli gave in her Disability Report.[7] Even that DOT number, however, refers

---

[6] The DOT defines the position as:

> Directs and coordinates activities of workers engaged in providing financial services to customers, and assists in cash management activities: Trains new employees, prepares work schedules, and monitors work performance. Examines documents prepared by subordinates, such as savings bond applications and safe deposit vault entry and exit records, to ensure compliance with establishment policies and procedures. Monitors branch office operations to ensure that security procedures are being followed. Evaluates establishment procedures and recommends changes to MANAGER, FINANCIAL INSTITUTION (financial) 186.167-086. Talks to customers to resolve account-related problems and to ensure positive public relations. Explains services to potential personal and business account customers to generate additional business for establishment. Assists workers to balance daily transactions, using calculator and computer terminal. Manages office in absence of MANAGER, FINANCIAL INSTITUTION (financial). May remove, count, and record cash from automated teller machine. May examine, evaluate, and process loan applications. May prepare, type, and maintain records of financial transactions.

DOT #186.167-070.

[7] The DOT defines the position as:

> Supervises and coordinates activities of personnel involved in performing internal operations in department or branch office of financial institution: Prepares work schedules and assigns duties to operations personnel to ensure efficient operation of department or branch. Audits accounts, records of proof, and certifications to ensure compliance of workers with established standard procedures and practices. Compiles required and special reports on operating functions of department or branch. Interviews, selects, and hires new employees. Directs employee training to improve efficiency and ensure conformance with standard procedures and practices. Verifies workers' count of incoming cash shipments. Controls supply of money on hand to meet branch's daily needs and legal requirements. Conducts staff meetings of operations personnel, or confers with subordinate personnel to discuss operational problems or explain procedural changes or practices. May be designated according to type of financial operations supervised as Operations Officer, Branch Office (financial); Operations Officer, Trust Department (financial).

(Footnote continued on next page)

to some branch-specific functions and would require additional testimony by a VE to clarify the discrepancies. The VE, however, was not aware of the description Metelli gave in her Disability Report and did not inquire as to the nature of Metelli's work other than to determine if it was "customer-related" or "non-customer related." R. at 60. Accordingly, the VE relied on an incorrect DOT number. A VE's testimony that is based on an incorrect DOT number does not provide substantial evidence to support a decision that a claimant is not disabled. Wynne, 2015 WL 4450953, at *6; Collins v. Astrue, No. 06-69-JJF, 2007 WL 2698202, at *10 (D. Del. Sept. 11, 2007).

Based on the limited information the ALJ obtained during the hearing about what functions Metelli's past work required and the fact that the ALJ did not include any mention in Metelli's RFC that Metelli had any mental limitations, the VE did not, and could not have, provided competent evidence that Metelli was able to perform the specific activities required by her prior occupation despite her cognitive limitations. Consequently, the VE's testimony did not provide an evidentiary basis upon which the ALJ could base a decision that Metelli could perform her prior work. A remand is required so that the ALJ can properly define Metelli's mental limitations, obtain a meaningful explanation of the intellectual requirements Metelli's prior work entailed and conduct a proper comparison of the two in order to reach a supportable decision whether Metelli could perform her prior work despite her limitations.

---

DOT #187.137-014.

## VI. CONCLUSION

For the foregoing reasons, I make the following:

## RECOMMENDATION

AND NOW, this 26th day of May, 2017, IT IS RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be GRANTED and that this matter be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation. The Commissioner may file objections to this Report and Recommendation within 14 days after receiving a copy thereof. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE